IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 10, 2008

No. 07-30725

Charles R. Fulbruge III
Clerk

In re: In the Matter of the Complaint of OMEGA PROTEIN, INC, as Owner of Fishing Vessel GULF SHORE, for Exoneration from or Limitation of Liability.

OMEGA PROTEIN INC., as Owner of Fishing Vessel GULF SHORE,

Plaintiff-Appellee,

v.

SAMSON CONTOUR ENERGY E & P LLC,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

Before KING, DeMOSS, and PRADO, Circuit Judges.

DeMOSS, Circuit Judge:

In the early morning hours of October 4, 2004, Plaintiff-Appellant Omega Protein, Inc's ("Omega") vessel struck an oil platform owned by Defendant-Appellee Samson Contour Energy E & P LLC ("Samson"). On appeal, we must consider whether the district court erred in assigning fault equally between Omega and Samson, and whether the court erred in allowing Omega to limit its liability under 46 U.S.C. § 30505. Finding no error, we affirm.

I.

Omega's vessel F/V GULF SHORE ("GULF SHORE") is a 396-ton steel hulled fishing vessel used to catch and process menhaden, a fish found in the Gulf of Mexico. GULF SHORE had various navigational aids, including an autopilot, a Furuno Model 1731 Mark-3 radar, and a Pinpoint Navigational Chart System. The radar was equipped with an anti-collision alarm, which emits a sound when an obstacle enters a field specified by the operator. The Pinpoint system shows computerized navigational charts on a screen and displays the vessel's progress across the chart. Between midnight and 1 a.m. on October 4, 2004, GULF SHORE left its base of operations in Cameron, Louisiana to proceed to fishing grounds at Freshwater Bayou, Louisiana. At the helm was Captain Luther Stewart. Before that night, Stewart had served as a menhaden pilot and captain for approximately twenty accident-free years. Omega did not provide Stewart with training on how to use the radar, and had no policy requiring him to use the anti-collision alarm. Stewart had not read the radar's manual and was unaware of the alarm's capabilities. GULF SHORE proceeded in an easterly direction at a speed of between nine and eleven knots. The weather was good, seas were calm, and visibility was seven to eight miles.[1]

After GULF SHORE had been underway for several hours, the vessel's chief engineer entered the wheelhouse to inform Stewart that a component of the vessel's refrigeration system had malfunctioned. Stewart scanned the horizon to see if any obstacles were in the vessel's path. Seeing none, he turned on the wheelhouse lights to examine the part. He agreed that the part was broken, and unless it was replaced, the vessel could not fish and would have to return to port. Stewart used his cell phone to call Omega's plant in Cameron, hoping to arrange

---

[1] Samson contends that conditions were "hazy," based upon a Report of Marine Accident, Injury or Death filed with the Coast Guard. It is unknown who filled out that portion of the report (which is, of course, hearsay). Stewart's uncontradicted testimony at trial was that visibility was seven to eight miles.

an air drop of a replacement part. Stewart only reached a security guard at the Cameron plant, and left a message for the marine department. Stewart then called Omega's plant in Abbeville, Louisiana to see if the part was in stock there. While Stewart was on the phone, and some ten to fifteen minutes after he turned on the wheelhouse lights, GULF SHORE struck Omega's oil platform ("Platform 17B"). The platform is situated near a cluster of oil platforms known as the Joseph's Harbor Rigs.

After the allision,[2] GULF SHORE circled Platform 17B. Stewart observed no lights and heard no sounding devices. Three other crew members of GULF SHORE likewise testified that the platform lacked functioning lights or a fog horn. Herbert Fisher, captain of F/V ANNA AMY, a vessel owned by Omega, testified that he passed Platform 17B prior to the allision on the morning of October 4, 2004. He stated that the platform lacked operational lights and sounding devices. Another captain, Lawson Schools of F/V COTE BLANCHE BAY, also an Omega vessel, testified that after the allision, he saw no lights operating on Platform 17B. He testified that when he had passed the same platform at night on other occasions, it was unlit.

Following the allision, various employees and agents of Samson boarded Platform 17B and inspected its lighting systems. Baker Energy was in charge of maintaining the lights on the platform. Baker's employee, Troy Whetstone, testified that he conducted tests just a few hours after the allision. Whetstone placed a piece of electrical tape over the photocell of each of the four lights to simulate darkness. In each case, the light turned on as intended. Terry Smith, Operations Manager of Wet Tech Energy (a third-party contractor hired by Samson to perform quarterly inspections of Platform 17B's lights) arrived at the

---

[2] "An allision is a collision between a moving vessel and a stationary object." In re Mid-South Towing Co., 418 F.3d 526, 528 n.1 (5th Cir. 2005) (quoting THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 14-2 (4th ed. 2004)).

platform several hours after Whetstone conducted his inspections. He performed tests on the electrical currents, batteries, solar panels, foghorn, and lights, and found no evidence to suggest that the lights and horn had not been working the previous night. Smith also performed some routine maintenance. Both Smith and Whetstone testified that they did not repair the platform's lights.

Additionally, Samson hired George Hero, an electrical engineer, to test the lighting systems on October 11, 2004 (one week after the accident). Hero was to determine "whether there was evidence of any recent modifications or repairs to the lighting and foghorn systems or any evidence that the systems should not have been operational on October 4, 2004." Hero opined that he saw no evidence that the lights had been repaired, and no evidence that the lights had been inoperative one week earlier.

## II.

The district court conducted a three-day bench trial in February 2007. In its judgment of March 9, 2007, the court found that "Omega sufficiently proved that platform 17B did not have operational lights on the morning of the accident." The court discredited the testimony adduced by Samson, noting that Baker Energy had not kept monthly maintenance reports for Platform 17B. Moreover, the court disregarded the testimony by Smith and Hero, noting that "it is entirely possible that the lights were repaired prior to their inspections," namely by Whetstone. The court found that Samson had committed a statutory violation by failing to have operable lights on a fixed structure. See 33 C.F.R. §§ 67.01-1, 67.05-1. Consequently, the vessel was not presumed to be at fault for the allision, and the burden remained on Samson to prove negligence.

The court next found that Samson carried its burden because it proved that Captain Stewart violated the International Regulations for Preventing

Collisions at Sea ("COLREGS"). See 33 U.S.C. § foll. 1602.[3] Namely, Stewart violated Rule 5 by failing to maintain a proper lookout by sight and hearing, as well as all other available means. See COLREGS, R. 5. Turning on the wheelhouse light created a "mirror effect" which greatly diminished Stewart's night vision. Use of a cell phone likewise prevented Stewart from maintaining a proper lookout. Moreover, the court found that Stewart had violated Rule 7 by failing to use all available means (i.e., the vessel's radar) to determine if a risk of collision existed. See COLREGS, R. 7. Namely, the "mirror effect" prevented Stewart from seeing the radar display. The court emphasized that "there was substantial testimony that Captain Stewart did not make effective use of his radar while navigating through the Joseph's Harbor Rigs."

Once Samson proved Stewart's negligence, the court noted that the burden shifted to Omega to prove that it did have knowledge or privity of Stewart's acts. Because the court characterized the cause of the allision as a "mistake of navigation," it asked "whether Omega exercised reasonable care in selecting a qualified and competent master?" The court noted that Stewart had all of the requisite licenses to operate GULF SHORE, and Stewart's record from twenty years of working on and operating menhaden vessels for Omega was clean. The court found that Omega had exercised reasonable care in selecting Stewart as captain. Consequently, the court found that Omega lacked privity or knowledge of Stewart's negligence, and was therefore entitled to limit its liability. In light of these findings, the court apportioned fault for the allision and resulting damages equally to Omega and Samson (50%–50%).

Samson moved for a new trial, or to alter or amend judgment. It contended that: (1) the court's verdict was against the weight of the evidence; (2) the court erred by failing to apply Trico Marine Assets Inc. v. Diamond B Marine Services,

---

[3] The COLREGS' text has been removed from the U.S. Code and the Code of Federal Regulations, but remains in force. See 33 U.S.C. § 1602, West Electronic Research Notes.

Inc., 332 F.3d 779 (5th Cir. 2003); and (3) the court had failed to make findings of fact or consider facts tending to show that GULF SHORE was unseaworthy. After briefing and oral argument, the court entered a Memorandum Ruling on July 2, 2007, denying Samson's motions. Samson appeals both the district court's judgment and its denial of post-trial relief. We have jurisdiction over this appeal because it seeks review of an interlocutory decree determining the rights and liabilities of parties to an admiralty case. See 28 U.S.C. § 1292(a)(3); Astarte Shipping Co. v. Allied Steel & Export Serv., 767 F.2d 86, 88 (5th Cir. 1985) (holding that appellate jurisdiction is present if the district court's order has "the effect of ultimately determining the rights and obligations of the parties with regard to the merits of the litigation").

## III.

As with any bench trial, following a maritime limitation case tried to a district court, the appellate court reviews findings of fact for clear error and questions of law de novo. See In re Mid-South Towing, 418 F.3d 526, 531 (5th Cir. 2005). Questions of fault, including determinations of negligence and causation, are factual issues, and may not be set aside on appeal unless clearly erroneous. Id.; Trico Marine Assets, 332 F.3d at 786. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). "Findings based on the credibility of witnesses demand even greater deference." Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV, 235 F.3d 963, 970 (5th Cir. 2001) (citing Fed. R. Civ. P. 52(a); Anderson, 470 U.S. at 575). "If a finding is based on a mixed question of law and fact, this court should only reverse 'if the findings are based on a misunderstanding of the law or a clearly

erroneous view of the facts.'" Bertucci Contracting Corp. v. M/V ANTWERPEN, 465 F.3d 254, 259 (5th Cir. 2006) (quoting FLORA MV, 235 F.3d at 966). The appellate court likewise reviews the grant or denial of limited liability for clear error. See Trico Marine Assets, 332 F.3d at 789; In re Hellenic Inc., 252 F.3d 391, 394 (5th Cir. 2001).

IV.

We first consider whether the district court's findings regarding the cause of—and comparative fault for—the allision are clearly erroneous before asking whether limitation of liability was proper.

Samson contends that (1) the lights of Platform 17B were operational on the night of the allision; (2) the allision could have been prevented if (a) the vessel had been equipped with functional navigational aids or updated charts, or (b) if Stewart had used his radar's anti-collision alarm; and (3) the district court erred in its apportionment of fault. Samson casts the court's alleged missteps as errors of law which should be reviewed de novo. Omega responds that the court in all instances properly stated the controlling legal standard, and merely rendered findings of fact that were contrary to Samson's preferences. Consequently, argues Omega, the court's findings regarding fault and the cause of the allision are subject to reversal only if they are clearly erroneous.

A.

First, Samson recites the evidence tending to show that the lights on Platform 17B were operational. Troy Whetstone testified that he tested the lights following the allision by placing a piece of electrical tape over the photocell, and found that the lights turned on. Samson also emphasizes that Terry Smith of Wet Tech Energy believed that the lights had been operational, and George Hero, an expert on electrical engineering, opined that there was no evidence of post-allision repairs. Nevertheless, the district court discredited this theory, noting that it appeared that Whetstone had repaired the lights. The

district court instead relied on the testimony of six witnesses who viewed the platform on the night of the allision, both before and after GULF SHORE hit it, and testified that the lights were off. All of those witnesses were affiliated with Omega in some way, while the witnesses presenting the contrary view were agents of Samson: there simply were no neutral witnesses present at the scene of the allision. Because the evidence regarding the lighting of Platform 17B is at best in equipoise, we may not overturn the district court's findings (and credibility determinations subsumed therein) as clearly erroneous. See Bertucci Contracting, 465 F.3d at 258-59 (citing Anderson, 470 U.S. at 575); In re Mid-South Towing, 418 F.3d at 535 ("Credibility determinations are the province of the trier of fact, which in this case is the district court.") (citations omitted).

In line with its theory that the lights of Platform 17B were operational, Samson contends that the court misapplied the presumption that when a moving vessel allides with a stationary object, the vessel is presumed to be at fault, and has the burden of demonstrating a contributing fault by the stationary object. See The Oregon, 158 U.S. 186, 197 (1895). However, this presumption only applies in the absence of evidence of fault. See In re Mid-South Towing, 418 F.3d at 531. Here, because Omega proved that Platform 17B was unlit, the district court concluded that Samson committed a statutory violation. In light of this finding, the court was correct to disregard the presumption of The Oregon. See id. The district court did not operate under a "misunderstanding of the law" and its findings were not based on "a clearly erroneous view of the facts." See Bertucci Contracting, 465 F.3d at 259. There was no error on this point.

## B.

Despite finding Platform 17B at fault, the district court still held that Samson proved that Stewart's negligence was a contributing cause of the allision: Stewart failed to maintain a proper lookout and failed to make effective use of the radar. Samson agrees that Stewart was at fault for the allision, yet

8

contends that the district court's findings regarding the cause of the allision are incorrect. Namely, Samson avers that Stewart "only made the decision to turn on his wheelhouse lights" because the Pinpoint navigational chart and the Furuno radar "did not show Samson's Platform 17B—or the cluster of twenty platforms in which it stands—2-3 miles dead ahead." Samson contends that the evidence proves that the navigational aids were defective or outdated. Moreover, Samson notes that Omega failed to train Stewart in how to use his navigational aids, specifically the anti-collision alarm. It thus lays the blame for the allision not on Stewart's "mistake of navigation," but rather on "Omega's hands-off approach to management of the GULF SHORE, particularly the training and supervision of Stewart . . . ." Additionally, Samson insists that even if Platform 17B had no operational lights, this did not contribute to the allision, because the "mirror effect" caused by the wheelhouse lights would have prevented Stewart from seeing the platform's lights. Samson presses causation because this issue bears on whether Omega can limit its liability.

Omega responds that there is no evidence that the navigational aids aboard GULF SHORE were out-of-date or defective. According to Omega, the evidence shows that Stewart failed to use the aids prior to the allision, not that the radar and Pinpoint system failed to show Platform 17B. Omega notes that the platform had been in place for over twenty years, and would have been on any nautical chart of the area. It submits that the district court's finding, that the allision was caused by a combination of Stewart's failure to maintain a lookout or properly use his (functional) navigational aids, together with the platform's lack of lighting, is not clearly erroneous.

On direct examination, Stewart testified that he did not look at his radar or Pinpoint chart prior to turning on the wheelhouse lights. He testified that he relied solely on his visual scan of the horizon to determine if any objects lay in GULF SHORE's path. On cross examination, however, Stewart appeared to

testify that he did not see the platform on the radar or Pinpoint system before or after the allision. Stewart also stated that he "never used the chart for that," and that he did not use his radar "to specifically look for [Platform 17B] after [the allision] happened. I think that was probably the furthest thing from my mind at the time."

In denying Samson's motion for post-trial relief, the court rejected the theory that the radar or Pinpoint system were defective or out-of-date, and also rejected Samson's argument that Stewart's lack of training in the use of the radar's anti-collision alarm caused or contributed to the accident.[4] The court expressly found that the lack of operational lights on Platform 17B precluded Stewart from seeing the platform before he turned on the wheelhouse lights, contributing to the allision. In light of Stewart's testimony that visibility was seven to eight miles on the night of the allision, if the platform's lights had been on, they would have been visible when Stewart last scanned the horizon, when GULF SHORE was two to three miles away from Platform 17B.

Having reviewed the entire record, we are not left with the firm conviction that the district court made a mistake in finding that Stewart's failure to use his navigational aids caused the allision. See Transorient Navigators Co. v. M/S SOUTHWIND, 714 F.2d 1358, 1364 (5th Cir. 1983). The evidence simply does not compel the conclusion that outdated or defective navigational aids were a factor. Cf. In re Mid-South Towing, 418 F.3d at 533. We affirm the district court's rulings, which are plausible in light of the record as a whole.

C.

Samson also argues that the district court's apportionment of fault was clearly erroneous. Samson posits that the court failed to make detailed and

---

[4] The court referenced testimony that anti-collision alarms are of limited utility in the portion of the Gulf of Mexico where GULF SHORE was navigating, owing to a profusion of obstructions which would constantly trigger the alarm.

specific findings of fact to support its conclusions. Cf. Fed. R. Civ. P. 52(a). The district court made the following finding in apportioning fault: "Based on the foregoing facts, the court finds that the apportionment of fault for the allision and resulting damages is: Omega 50% and Samson 50%."

In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault. United States v. Reliable Transfer Co., 421 U.S. 397, 411 (1975). The "clearly erroneous standard governs a trial court's allocation of damages among vessels." Mac Towing, Inc. v. Am. Commercial Lines, 670 F.2d 543, 547 (5th Cir. 1982) (citations omitted). "Where both parties to a collision are in violation of statutes designed to prevent collisions, the court may apportion fault between the parties, unless either party proves that its statutory violation was not a substantial contributing cause of the collision." Stolt Achievement, Ltd. v. DREDGE B.E. LINDHOLM, 447 F.3d 360, 364 (5th Cir. 2006) (citation omitted). Moreover, "the calibration of culpability simply is not susceptible to any real precision." Id. at 370 (quotation omitted). The trial court does not mechanically tally errors, but "must determine, based upon the number and quality of faults by each party, the role each fault had in causing the collision." Id.

Samson does not indicate what relative percentage of fault it believes was appropriate—aside from its insistence that Omega was solely at fault for the allision. While the court did not provide a detailed explanation for its 50-50 apportionment of fault, it made such apportionment "[b]ased on the foregoing facts." The adduced facts established statutory violations by both Omega and Samson which caused the allision. A court may apportion fault equally in a close case. See Mac Towing, 670 F.2d at 547 ("That a court divided damages equally among the parties does not mark a failure to follow Reliable Transfer. If the court finds the parties equally at fault, so be it. In establishing comparative negligence in admiralty, the Supreme Court certainly did not delete the number

'50' from the federal courts' vocabulary."); cf. Reliable Transfer, 421 U.S. at 411 (holding that liability "is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault"). The district court carefully weighed the evidence in reaching its decision, and correctly found that both parties' violations contributed to the allision. We do not believe that the court's equal apportionment of fault was clearly erroneous, and affirm.

## V.

Samson contends that the district court erroneously granted limitation of liability to Omega. Seeking de novo review, Samson avers that the court applied an incorrect legal standard. The crux of this argument is that the court "ignore[d] the plethora of evidence of Omega's negligence and the unseaworthiness" of GULF SHORE. Samson insists that if the court had properly applied the law, it would have denied Omega's petition. As we explain below, we believe that the district court correctly applied circuit precedent to the facts. Because there was no misunderstanding of the law, we review for clear error. See FLORA MV, 235 F.3d at 966.

## A.

Under the Limitation of Liability Act, a vessel owner may limit its liability for maritime casualties to "the value of the vessel and pending freight." 46 U.S.C. § 30505(a).[5] "However, if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." Trico Marine, 332 F.3d at 789 (citing Cupit v. McClanahan Contractors, Inc., 1

---

[5] In 2005, Congress recodified portions of title 46, United States Code. See Pub. L. No. 109–304 (2005). Section 30505 was previously numbered as § 183(a) of the Appendix to title 46. Congress's intent was to "codif[y] existing law rather than creating new law." See H.R. Rep. 109–170, at 2 (2005), reprinted in 2006 U.S.C.C.A.N. 972, 973. Therefore, pre-amendment cases applying former § 183(a) are treated as having full force of law.

F.3d 346, 348 (5th Cir. 1993)); see § 30505(b). We have stated that "privity or knowledge" "implies some sort of 'complicity in the fault that caused the accident.'" Brister v. A.W.I., Inc., 946 F.2d 350, 355 (5th Cir. 1991) (quoting Nuccio v. Royal Indem. Co., 415 F.2d 228, 229 (5th Cir. 1969)). The owner has privity "if he personally participated in the negligent conduct or brought about the unseaworthy condition." Trico Marine Assets, 332 F.3d at 780 (quoting Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1473 (5th Cir. 1991)). A corporate owner is assumed to know what the corporation's managing officers knew or "should have known with respect to conditions or actions likely to cause the loss." Id. at 789-90 (quoting Pennzoil, 943 F.2d at 1473-74). "The question of 'privity or knowledge must turn on the facts of the individual case.'" Brister, 946 F.2d at 355-56 (quoting Gibboney v. Wright, 517 F.2d 1054, 1057 (5th Cir. 1975)).

In Brister, we surveyed Supreme Court and circuit court cases, and noted that knowledge of an unseaworthy or negligent condition is normally imputed to a corporate owner if the "condition could have been discovered through the exercise of reasonable diligence." Id. at 356. Moreover, "a finding of negligence indicates complicity in the cause of the accident sufficient to make limitation unavailable." Id. (citations omitted). However, this Court also noted two exceptions to this rule. First, mere "mistakes of navigation" by an otherwise competent crew do not bar limitation of liability. Id. (quoting In re Hellenic Lines, Ltd., 813 F.2d 634, 638 (4th Cir. 1987)).[6] Second, whether negligence may

---

[6] Samson argues that Brister is dicta for present purposes because that was a Jones Act case. Yet no subsequent cases have called into question the correctness of Brister's 'dicta.' Cf. In re Kristie Leigh Enters., Inc., 72 F.3d 479, 481 (5th Cir. 1996); see also In re Hellenic Inc., 252 F.3d at 396. The rule for mere mistakes of navigation also has a considerable pedigree; the Supreme Court noted in Coryell v. Phipps, 317 U.S. 406, 412 (1943), that "[o]ne who selects competent men . . . and who is not on notice of any defect . . . cannot be denied the benefit of limitation . . . ." Additionally, the Fifth Circuit applied this rule prior to Brister. See, e.g., Cont'l Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1377 n.15 (5th Cir. 1983) (en banc) (noting that "no court has previously denied a corporate shipowner limitation of liability for a master's

be imputed can be determined in reference to the negligent employee's stature within the corporate hierarchy; if sufficiently high, limitation of liability is precluded. Id. Samson does not advance this theory.

## B.

Only the first "privity or knowledge" exception noted in Brister—for mere mistakes of navigation—is relevant in the present case. The district court characterized Stewart's decision to turn on the wheelhouse lights and his failure to maintain a lookout or use his radar as mistakes of navigation. Samson argues that this conclusion is wrong, and that GULF SHORE was unseaworthy. Unseaworthiness and mistakes of navigation are related yet distinct matters. See Farrell Lines Inc. v. Jones, 530 F.2d 7, 10 n.2 (5th Cir. 1976). Seaworthiness is "reasonable fitness to perform or do the work at hand." Id. When unseaworthiness exists due to equipment that is defective at the start of a voyage, and the defects can be discovered through the exercise of reasonable diligence, limitation of liability is less likely to be available—but not necessarily precluded. See Brister, 946 F.2d at 357 & n.5. In contrast, "[e]rrors in navigation or other negligence by master or crew are not attributable to (the vessel owner) for limitation purposes." Mac Towing, 670 F.2d at 548 (quotation omitted). Ultimately, regardless of whether a mistake of navigation or unseaworthiness caused the allision, the question of whether Omega lacked privity or knowledge, and thus may limit its liability, is fact-specific and subject to reversal only if clearly erroneous. See Trico Marine Assets, 332 F.3d at 789.

Samson contends that the district court committed legal error by misapplying circuit precedent from Trico Marine Assets. Reprising its arguments

---

navigational errors at sea when the owner has exercised reasonable care in selecting the master"); Mac Towing, Inc., 670 F.2d at 548 ("Ordinary 'errors in navigation or other negligence by master or crew are not attributable to (the shipowner) for limitation purposes.'") (quoting Tittle v. Aldacosta, 544 F.2d 752, 756 (5th Cir. 1977)). Therefore, the statement of the rule in Brister in actuality reflects well-established, binding precedent.

regarding causation, Samson alleges that GULF SHORE allided with Platform 17B because the vessel's radar was defective or its charts were out-of-date. Additionally, Samson submits that because Omega did not train Stewart in the use of the radar's anti-collision alarm, which might have prevented the allision, the vessel was unseaworthy. Unseaworthiness would have existed prior to GULF SHORE departing on the night of the allision, and unlike a mistake of navigation, would be within Omega's privity or knowledge. Thus, concludes Samson, the court committed legal error by allowing Omega to limit its liability. Omega points to the finding that the allision was caused by Stewart's mistake of navigation, and not unseaworthiness. Omega argues that the district court did not commit legal error by asking whether Omega proved that it exercised reasonable care in selecting a competent master, and then answering this question affirmatively. Omega insists that this case is factually distinguishable from Trico Marine Assets.

In Trico Marine Assets, a vessel departed port in heavy fog. 332 F.3d at 783. The captain did not post a lookout, and ran at full speed—eighteen knots—although this generated enough noise to drown out the noise of other vessels and fog signals, and made it difficult to hear the radio. Id. at 783-84. The captain misread his radar and attempted to conduct an improper passing maneuver, leading to a collision. Id. at 784. The district court found that the captain had no training in how to use the radar, and had not otherwise received safety training. Id. at 790. The vessel owner had not evaluated the vessel's seaworthiness or the captain's qualifications, had not inspected the vessel logs, and did not employ a safety manager. Moreover, the owner knew that the captain had previously operated the vessel in a reckless manner in the fog, yet did not prevent the captain from doing so again. The district court denied limitation of liability. Id. We affirmed. We noted that navigational errors alone typically do not justify denying limitation of liability, but "the present case

presents far more than mere navigational errors." Id. at 790. The vessel owner was aware that the captain had trouble hearing his radio. Moreover, the captain had so little familiarity with his radar system that he could not determine other vessels' directions of travel, and this ignorance led to a collision. Under the facts of that case, we held that the owner knew or should have known that the vessel was unseaworthy and the captain incompetent. Id.

We believe that the present case is distinguishable. Stewart did not have a pattern of improper or unsafe behavior. Rather, he had a spotless record in his twenty years of working the menhaden fishery as a pilot and captain. While Omega did not train Stewart on how to use the anti-collision alarm, the district court found that this feature was not very useful because the Gulf is littered with obstructions. Crucially, as discussed above, the district court did not find that defects in the radar or Pinpoint system caused the allision. Rather, the "mirror effect" caused by the wheelhouse lights prevented Stewart from seeing out the windows or viewing the radar. In contrast, the captain's failure in Trico Marine Assets to understand what he saw on his radar display was a proximate of the collision. See 332 F.3d at 790. Because that captain was making a blind run through the fog, radar was the sole means by which he could see obstacles in his vessel's path. Here, because defective navigational aids played no role in the allision, they are irrelevant to whether Omega may limit its liability. See In re Hellenic Lines, Ltd., 813 F.2d at 639 ("Only conditions of unseaworthiness that contribute to the collision are relevant to determining whether the shipowner is entitled to limitation.") (citation omitted).

Samson is not the first to ask us to reverse a district court's findings and hold on appeal that unseaworthiness, rather than mistakes of navigation, caused a casualty. In Mac Towing, we considered—and rejected—a similar argument concerning seaworthiness and limitation of liability. See 670 F.2d at 547-48. In that case, which arose out of the collision of barges towed by two tugs, the

district court held that both tugs made errors in navigation. One owner moved for limitation of liability, which the court granted. The adversary appealed. Id. at 546. We emphasized that a captain's or vessel's minor deficiencies do not necessarily add up to unseaworthiness:

> Alamo argues that Captain Higgerson was ignorant of the most basic facts of navigation and speculates that perhaps he lacked a chart of the area. Such defects allegedly rendered [the vessel] unseaworthy. This point the trial judge rejected in his findings of fact. The record sustains his decision. It demonstrates that Higgerson was a qualified pilot with long experience piloting similar tugs in that area. We agree with the District Court that his deficiencies did not rise to the level of unseaworthiness and thus does not constitute 'privity or knowledge.'

Id. at 548.

The Eighth Circuit recently applied similar reasoning in rejecting an argument that a pilot's failure to make effective use of his radar per se rendered his vessel unseaworthy. In re Mo. Barge Lines, Inc., 360 F.3d 885, 891 (8th Cir. 2004). There, two vessels collided because one pilot believed that a "mass of lights" he saw at night on the Mississippi River was a construction site, not another vessel. Id. The pilot would have realized that the lights were a vessel if he had increased the range on his radar. However, the pilot's failure to use the radar effectively did not mandate a finding that the vessel was unseaworthy. Id. at 891-92. Instead, the evidence supported a finding that the pilot's "decision not to increase his radar's range when he first noticed the lights was navigational error rather than an example of unseaworthiness." Id. at 892. Similarly, in this case, Stewart committed navigational error by failing to look at his radar and Pinpoint system. Merely because better use of the navigational aids might have helped prevent the allision does not compel a finding that Stewart was an incompetent master or that GULF SHORE was unseaworthy.

C.

To recap, Samson has demonstrated that Omega did not do everything within its power to ensure that Stewart knew the full capabilities of the vessel's radar, nor did it have a protocol in place dictating when features such as the anti-collision alarm were to be used. This may not be the most prudent way to run a ship. However, the "privity or knowledge" standard does not require a vessel owner to take every possible precaution; it only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence. The district court found that Omega selected a competent master and rejected the contention that the vessel was unseaworthy. Those findings are supported by the record.

Samson has doggedly insisted that the district court committed legal error. After carefully considering the parties' arguments, it is apparent that "[o]nce again, we are urged to second guess the factual findings of the trial court in an admiralty matter." See Mac Towing, 670 F.2d at 544. Because the district court correctly determined that Stewart's mistakes of navigation and Platform 17B's lack of functioning lights caused the allision, Samson's theory regarding unseaworthiness of GULF SHORE is untenable. After reviewing the record as a whole, we are not "left with a definite and firm conviction that a mistake has been committed." Cf. Transorient Navigators, 714 F.2d at 1364. We therefore affirm the district court's grant of limitation of liability to Omega.

VI.

The district court properly applied the law, and its findings of fact are not clearly erroneous. Its rulings are therefore in all respects

AFFIRMED.