# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 1, 2010

No. 08-61125

Lyle W. Cayce
Clerk

OSPREY SHIP MANAGEMENT INC; CORMORANT SHIPHOLDING CORP.,

> Plaintiffs - Appellants - Cross-Appellees

v.

DON FOSTER; PASCAGOULA BAR PILOTS ASSOCIATION,

> Defendants - Appellees - Cross-Appellants

v.

UNITED STATES OF AMERICA,

> Defendant - Appellee

v.

NORTHROP GRUMMAN SHIP SYSTEMS INC

> Defendant - Appellee - Cross-Appellee

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:05-CV-390

---

Before KING, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR.

No. 08-61125

This case arises from an allision between a commercial vessel and a submerged submarine launchway in the Pascagoula River in Mississippi. The district court issued a thorough and well-reasoned 72-page opinion finding the compulsory pilot of the vessel 50% liable and the vessel's master 50% liable, and denying all other claims. We DISMISS Pilot Foster's appeal of the adverse summary judgment ruling against him and AFFIRM in all other respects.

## I. BACKGROUND

This lawsuit arises out of damage sustained by the vessel M/V AMERICAN CORMORANT ("CORMORANT") on August 15, 2004, when it allided with a submerged submarine launchway owned by Northrop Grumman Ship Systems, Inc. ("NGSS"). The CORMORANT was, at the time of the accident, owned by Osprey Ship Management Inc. and Cormorant Shipholding Corporation (collectively "Osprey"). The CORMORANT is an oceangoing semi-submersible heavy lift vessel. On August 15, 2004 it was scheduled to enter the Port of Pascagoula, Mississippi and dock at a wharf known as the Old Grain Docks. The weather was clear, with "smooth to slight" seas, light wind, and unimpaired visibility. The compulsory local pilots, Pilots Foster ("Pilot Foster") and Mosso ("Pilot Mosso"), boarded the ship around 9 a.m. south of the mouth of the river. The master of the CORMORANT was Captain John Potter ("Captain Potter"). The vessel was equipped with a magnetic compass and gyrocompass, a fathometer or echo sounder, a course recorder, radar, an automatic radar plotting aid, GPS, and radiotelephone communications equipment, all of which were operable but none of which was utilized. No lookout was posted.

The CORMORANT is 738 feet long and 135 feet wide. Her deepest draft is just over 33 feet, which gives her one foot of clearance at the deepest part of

R. 47.5.4.

No. 08-61125

the improved channel which is 34 feet at its deepest point. At trial Pilot Foster and Captain Potter testified that they intended to keep the vessel in the improved channel at all times, due to its draft of 33 feet. Due to the CORMORANT's size, all other port traffic was stopped during the vessel's arrival and departure, and the ship took on board two compulsory local pilots for the journey, as well as two accompanying tugs.

Pilot Foster was piloting the vessel during the time of the events in question; Captain Potter was within earshot of him at all times. Around 11 a.m., while the vessel was near the Northrop Grumman Shipyard, which is owned by NGSS, the CORMORANT began listing four degrees to starboard. Later investigation revealed that the vessel had allided with a submerged object, to wit, the northwest corner of a submarine launchway, known as Launchway Number 1 ("LW1"). LW1 is owned by NGSS and was marked at the time of the accident with a red buoy known in this litigation as Red Buoy 2.

Osprey sued various parties in federal court, including Pilot Foster, NGSS, the Pascagoula Bar Pilot's Association ("PBPA"), and the United States, who comprise the remaining parties in this appeal. The district court granted summary judgment in favor of the United States on the grounds that the publication of nautical charts is covered by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, *et seq,* and that the court therefore lacked jurisdiction over the claim. The district court also granted summary judgment in favor of the PBPA, holding that it was not liable for Pilot Foster's actions under settled federal law. The district court denied Pilot Foster's motion for summary judgment on the question of his liability. The case against Pilot Foster and NGSS proceeded to a bench trial.

At the close of the bench trial the district court issued an extremely detailed and thorough opinion. Of most relevance to this appeal, the district court found that Red Buoy 2, which was maintained by NGSS, was properly

3

No. 08-61125

positioned at the time of the allision. In doing so, the district court relied on measurements taken several weeks before the allision and on measurements taken a few hours after the allision. Although Pilot Foster claimed that the vessel cleared Red Buoy 2 with room to spare, there was testimony from an observer on the shore that the vessel did not clear Red Buoy 2 but instead came in contact with it and dragged it along in the water for 25-30 yards. In addition, while, as Osprey points out, the anchor block of the buoy was found 20 feet east of the end of LW1, the record indicated that this particular buoy's position could be anywhere within a 40-60 foot radius of the anchor block due to the length of the chain between the buoy and the anchor block. The district court therefore did not clearly err in finding that, based on measurements taken before and after the allision, as well as the testimony of the observer on shore, Red Buoy 2 was properly located to mark LW1.

Further, the district court found that the location of Red Buoy 2 was not the cause-in-fact of the allision. Instead, the district court found that the cause-in-fact of the allision was the negligence of Pilot Foster and Captain Potter in allowing the vessel to drift 70 feet from the improved channel into 26 to 28 feet of water, which was entirely too shallow for its 33-foot-draft. In summing up its conclusions, the district court found and held that:

> The M/V AMERICAN CORMORANT left the channel and allided with the Launchway due . . . to (1) Pilot Foster's unreasonable reliance on Red Buoy No. 2 as a channel marker to determine the position of the M/V AMERICAN CORMORANT; (2) Pilot Foster's allowing the deep-draft vessel to get too close to Red Buoy No. 2; (3) Captain Potter's failure to perform or ensure the performance of proper pre-planning of a track or passage plan for the vessel; (4) Captain Potter's failure to fix and plot the vessel's position along the track; and (5) Captain Potter's placing too much reliance upon the knowledge and skill of Pilot Foster. The Court finds that it was not necessary to rely upon Red Buoy No. 2 to keep the vessel within the improved channel because there were sufficient fixed objects ashore to ascertain the vessel's position, and because the vessel had

4

No. 08-61125

> sufficient equipment on board to safely navigate through the area without relying on the buoy. The Court finds that it was unreasonable to rely solely on a floating buoy to ensure that a vessel of this size and draft remained within the improved channel.

*Osprey Ship Mgmt. Inc. v. Foster*, No. 1:05CV390-HSO-RHW, 2008 WL 4371376, at \*16 (S. D. Miss. Sept. 8, 2008). The district court assessed the comparative fault of the parties at 50% for Pilot Foster and 50% for Captain Potter, for whom Osprey was responsible. The district court calculated the total damages and costs at $1,524,128.58. The district court also awarded prejudgment interest on the amount for which Pilot Foster was held liable. Osprey and Pilot Foster timely appealed.

## II. ANALYSIS

### Summary Judgment

At the summary judgment stage the district court dismissed the United States and the Pascagoula Pilots Bar Association from the suit and denied summary judgment to Pilot Foster. Osprey appeals the first two of these rulings and Pilot Foster appeals the third.

We review a grant of summary judgment *de novo. Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). All inferences must be construed in favor of the nonmoving party. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

### *The United States*

Osprey's first contention is that the district court erred by dismissing the United States from the suit on the basis of the discretionary function doctrine.

No. 08-61125

In its complaint, Osprey claimed that the United States, through its agencies the Army Corps of Engineers ("COE"), the National Oceanic and Atmospheric Administration ("NOAA"), and the United States Coast Guard, was liable under the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 30901 *et seq.*, for the damage to the CORMORANT because the Government published charts with allegedly incorrect information about the location of Red Buoy 2 and failed to enforce permit requirements for LW1. The district court rejected these arguments, holding that the discretionary function exception stripped the court of jurisdiction over the case. We agree.

Federal courts have no subject matter jurisdiction over suits against the United States unless the Government has waived its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 591 (1941). The SAA contains a waiver of sovereign immunity in admiralty cases where the claim at issue could be brought against a private party. It does not, however, waive immunity for acts by Government agencies that fall within the discretionary function exception contained in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, *et seq*. *See Wiggins v. United States Through Dep't of Army*, 799 F.2d 962, 966 (5th Cir. 1986). The discretionary function exception protects the Government from liability for any claim based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Application of this exception is a two-step process. First, the court must determine whether the action in question involves "judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). An action does *not* involve judgment or choice if a federal law, regulation, or policy provides mandatory requirements or specific instructions as to how an employee must act, since in that case the employee "has no rightful option but to adhere to the directive." *Gaubert*, 499 U.S. at 322 (internal citation omitted).

6

No. 08-61125

If an action does involve judgment or choice, the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The "kind" of actions the exception was meant to protect are those involving social, economic, and political policy choices. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). Once the Government asserts the discretionary function exception, the party bringing suit must establish that it does *not* apply in order to establish jurisdiction. *See, e.g., OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (internal citations omitted). It is therefore incumbent upon Osprey in this case to prove that the discretionary function exception applies.

On appeal, Osprey argues that the United States is liable because (1) the NOAA published a misleading nautical chart in violation of a mandatory duty, and (2) the COE failed to monitor NGSS' compliance with its launchway permits in violation of a mandatory duty. Osprey is mistaken on both counts.

As to its contention that the Government is liable for publishing an inaccurate chart[1], Osprey relies on *Sheridan Transportation Co. v. United States*, 897 F.2d 795 (5th Cir. 1990) (*Sheridan II*), in which this court held that the Government was liable for publication of a misleading chart where the Coast Guard had placed a buoy to mark a submerged obstruction, the Government had published a chart showing the buoy's location, and then the Coast Guard had moved the buoy without providing any notice to mariners. *Sheridan II*, 897 F.2d at 797. The keys to liability in that case were (1) that the buoy was a Government-maintained buoy, not a private navigational aid, and (2) that the

---

[1] The district court ultimately found that the chart in question was *not* incorrect. That finding of fact, however, is not relevant to the question of the Government's dismissal at the summary judgment stage, since it was a disputed question of fact at the point when the Government was dismissed.

No. 08-61125

Government had moved the buoy itself and then not issued any update as to its position. Such a situation is inapposite to this case, which concerns a privately maintained buoy that the Coast Guard had no hand in positioning, much less moving. Further, even if the chart were misleading, Osprey still must show that the discretionary function exception does not apply. Osprey relies on language in NOAA manuals that it claims establishes a mandatory duty on NOAA's part to mark submerged obstacles. These arguments are unavailing. The manual from which Osprey quotes in a disingenuous, if not misleading manner, refer not to the creation of nautical charts but to the creation of various preliminary documents and nautical drawings that NOAA relies upon in finalizing a nautical chart.[2] The final decision as to what kinds of nautical information to include on a chart is firmly within the discretionary function exception. *Accord Limar Shipping Co. v. United States*, 324 F.3d 1, 10 (1st Cir. 2003) ("The allocation of resources for the production and dissemination of ocean charts by a budget-constrained entity like NOAA is a policy decision that falls within the ambit of the discretionary function exception."). Osprey therefore has not met its

---

[2] For instance, Osprey argues that the Government was required to depict LW1 itself on the chart (as opposed to Red Buoy 2 which marked LW1 and was depicted on the chart) because the U.S. Department of Commerce Hydrographic Manual indicates that "[a] variety of submerged obstructions is encountered in hydrographic surveying, all of which must be shown . . . ." Osprey thus implies that the Hydrographic Manual requires that all submerged obstructions be shown on nautical charts. But in fact the end of that sentence in the Manual is that such obstructions must be shown "on the *smooth sheet.*" (emphasis added). Similarly, Osprey quotes the Hydrographic Manual as saying that "[a]ids to navigation which are established privately or by state or local governments shall be located by the hydrographic party, and their positions shall be shown" but neglects to provide the end of the sentence which is "on the boat and smooth sheets." The "smooth sheet" is a tool that hydrographer use to summarize their surveys of hydrographic terrain, and is not a nautical chart. A "boat sheet" is a work sheet plotted during field operations from preliminary field data. Neither a smooth sheet nor a boat sheet is the same thing as a published nautical chart, and neither of these statements in the Hydrographic Manual imposes a requirement, mandatory or otherwise, that the Government depict submerged obstructions or private aids to navigation on the nautical charts themselves.

burden on the discretionary function doctrine with regard to the publication of the nautical chart in question.

Osprey's other contention on the discretionary function doctrine is that the Government is liable for failing to monitor NGSS' compliance with its launchway permits. The parties concede the current regulation in place makes such monitoring discretionary. 33 C.F.R. § 326.4. The district court held that this was the regulation that applied. Even if, as Osprey urges, the district court were incorrect in so ruling, however, the previous regulation also made such monitoring discretionary. The regulation in force when LW1 was built stated that "District Engineers will therefore supervise operations landward of harbor lines sufficiently to assure themselves that all work proposed is either of the character authorized by the establishment of the line or has been properly authorized and that there is no encroachment channel-ward of approved limits." 33 C.F.R. § 209.390 (1949). The language of this regulation is clearly not mandatory. The regulation states that the District Engineers will supervise operations "sufficiently to assure themselves that all work proposed is . . . authorized." *Id.* This language leaves room for discretionary judgments as to the kind of supervision that is necessary, presumably based on factors like available workforce, the time and money required to perform different kinds of supervision, and the risk to the public or to vessels or mariners of varying levels of permit compliance checks or supervision. This is the essence of a discretionary function. *Cf. In re Glacier Bay*, 71 F.3d 1447, 1454 (5th Cir. 1995) (holding that a particular regulation "required the hydrographers to '[s]tate whether the survey is complete and adequate to supersede prior surveys for charting. Identify any part of the survey that is incomplete or substandard in any way.' This provision leaves an element of judgment or choice in the hands of those filling out the reports, because they must decide what constitutes an 'adequate' or 'substandard' aspect of the survey.") (internal citation omitted). The district

court found that records indicated at least one inspection of the launchway was performed in 1969. Thus the Government exercised its discretion under the previous regulation, while it was in force, to inspect LW1 "sufficiently to assure" itself that all was in order. Osprey has failed to meet its burden on the discretionary function doctrine and the district court did not err in dismissing the United States as a party to this action.

*The Pascagoula Bar Pilots Association (PBPA)*

Osprey also argues that the district court erred in dismissing the PBPA from the action on the ground that it was not liable for Pilot Foster's negligence just because he was a member of the PBPA. Osprey now concedes that this argument is foreclosed by longstanding circuit and Supreme Court precedent. *See Guy v. Donald*, 203 U.S. 399, 407 (1906); *Dampskibsselskabet Atalanta A/S v. United States*, 31 F.2d 961, 962 (5th Cir. 1929) ("The fundamental principle underlying the exemption of pilots' associations from liability for negligence of their members in performing their duties as pilots is that the association exercises no control over the manner in which those duties are to be performed, and therefore a pilot cannot be said to be an agent of the association in that respect.") The district court did not err in dismissing the PBPA from the action on this basis.

*Pilot Foster*

Pilot Foster, for his part, argues on appeal that the district court erred in denying his motion for summary judgment on the question of liability for the allision. We lack jurisdiction over this issue because there has been a full trial and an adverse ruling against Pilot Foster on the issue addressed by that motion for summary judgment. The denial of summary judgment, which concerned the same question of liability subsequently decided adversely to Pilot Foster at trial,

is therefore moot. *Black v. J.I. Case Co.*, 22 F.3d 568, 570-71 (5th Cir. 1994); *see also Brown v. Slenker*, 220 F.3d 411, 421 n.9 (5th Cir. 2000).

Bench Trial

Osprey and Pilot Foster also appeal several of the district court's findings of fact as to causation and liability. When a district court tries an admiralty action without a jury, its factual findings are reviewed under the "clearly erroneous" standard. *In re Omega Protein, Inc.*, 548 F.3d 361, 367 (5th Cir. 2008). "Questions of fault, including determinations of negligence and causation, are factual issues, and may not be set aside on appeal unless clearly erroneous." *Id.* Under this standard a district court's findings will be reversed only if this court has "a definite and firm conviction that a mistake has been committed." *Water Craft Mgmt., LLC v. Mercury Marine, Etc.*, 457 F.3d 484, 488 (5th Cir. 2006). The district court found that Pilot Foster was 50% liable for the allision and that Captain Potter was 50% liable, and that NGSS was not liable. We review each finding in turn.

*Pilot Foster:*

The district court found that Pilot Foster was negligent because (1) he unreasonably relied on Red Buoy 2, a privately maintained navigation aid, as a channel marker when in fact it was an obstruction marker for LW1, and (2) he took the vessel, which had only one foot of room to spare in the deepest part of the improved channel, into much shallower waters that were too shallow for the vessel's draft. As the district court explained, compulsory pilots are held to a high degree of care. *See Atlee v. Packet Co.*, 88 U.S. 389, 396-97 (1874). This circuit has called this standard "an unusually high standard of care." *Bunge Corp. v. M/V FURNESS BRIDGE,* 558 F.2d 790, 798 n.6 (5th Cir. 1977). The standard arises from the pilot's knowledge of local conditions, the very reason

that his hiring is required. Thus, "[a]bsent a finding of actual knowledge, the pilot may be charged with knowledge of a local condition as a matter of law." *Id.* The district court concluded that "as a matter of law, Pilot Foster actually knew, or at least should have known, the approximate location of the launchways, which had been permanently located in the Pascagoula River during his entire career as a pilot. He should further have been actually aware of the risk posed by taking a deep-draft vessel like the M/V AMERICAN CORMORANT outside the improved channel and in such close proximity to a privately-maintained obstruction buoy marking the known hazard." *Osprey Ship Mgmt. Inc.*, 2008 WL 4371376, at *24.

Pilot Foster argues that he acted reasonably in relying on Red Buoy 2 because his experience had been that as long as he was west of Red Buoy 2 he was west of LW1 and would not hit the obstruction, and that this was common knowledge among the local harbor pilots. The district court, however, made extensive factual findings as to the reasonableness of relying solely on Red Buoy 2 for navigational purposes. The district court found that Pilot Foster intended to stay in the improved channel due to the vessel's deep draft, and that Pilot Foster was aware that a prudent mariner knows not to rely solely on floating objects, particularly privately maintained buoys, as navigational aids, because such aids are known to move with the tide, weather, and other conditions. This warning was even contained on the NOAA chart showing the location of LW1 and Red Buoy 2. We cannot say these findings were clearly erroneous. Even if it were true that it was common knowledge that staying west of Red Buoy 2 would keep a vessel west of LW1, the district court was not clearly erroneous in finding that Pilot Foster nevertheless understood that floating navigational aids should not be relied upon to the exclusion of other navigational aids because they can float or move at any time, and in finding that given his knowledge of the river and of the location of LW1 (which his father, a local pilot, had hit with a

vessel previously) it was negligent to bring the vessel out of the improved channel and so close to Red Buoy 2.

Pilot Foster also argues that the district court incorrectly determined he was negligent because there is no legal requirement that a vessel stay within the dredged channel. Pilot Foster is correct – as a matter of abstract law, there is no such legal requirement. There is, however, a longstanding legal requirement that a pilot act as a prudent mariner, and in this case, the district court did not err in finding that a prudent mariner would not have taken a vessel with a 33-foot draft out of the improved channel into much shallower waters, much less in the direction of a known and marked submerged obstruction. *See Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen*, 404 F.2d 1001, 1006 (4th Cir. 1968) (finding a pilot liable for an allision with a fixed obstruction because while "[a]dmittedly, [the] vessel was not obligated to keep within the auxiliary [channel] . . . nonetheless [the pilot] was ignoring the known portending menace"), *overruled on other grounds by Faust v. South Carolina State Highway Dept,* 721 F.2d 934 (4th Cir. 1983).

*Captain Potter:*

The district court found that Captain Potter was 50% liable for the allision, largely for relying too heavily on Pilot Foster. The master of a ship "is entitled to assume that the pilot is an expert on local conditions and practices, until it becomes manifest that the pilot is steering the vessel into danger." *Avondale v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 492-93 (5th Cir. 1994). This, in turn, means that the master must at least know enough about what is going on with his vessel and its journey so as to evaluate the compulsory pilot's performance: "If the master's responsibility to intervene in cases of great necessity means anything, it must require that he have an adequate level of information to determine when 'great necessity' arises." *Avondale*, 15 F.3d at

13

493. As the Supreme Court has explained, "In well-conducted ships the master does not regard the presence of a duly-licensed pilot in compulsory pilot waters as freeing him from every obligation to attend to the safety of the vessel; but that, while the master sees that his officers and crew duly attend to the pilot's orders, he himself is bound to keep a vigilant eye on the navigation of the [vessel] and, when exceptional circumstances exist, not only to urge upon the pilot to use every precaution, but to insist upon such being taken." *The Oregon*, 158 U.S. 186, 195 (1895) (citation and quotations omitted).

In light of this legal framework the district court found that, as Captain Potter's own expert agreed on the stand, Captain Potter had relied too heavily on Pilot Foster. Specifically, the district court found that Captain Potter had failed to perform his responsibilities as Captain, and that he was negligent insofar as he "(1) did not exercise the degree of care required of a master in similar circumstances; (2) did not properly plan or make and keep himself adequately informed; (3) relied exclusively on the pilot; and (4) allowed the vessel to stray from the improved channel and strike [LW1]." *Osprey Ship Mgmt. Inc.*, 2008 WL 4371376, at *26.

Osprey argues on appeal that Captain Potter was entitled to rely solely on the official charts, while Pilot Foster was expected to know more about detailed local conditions. The problem with this argument is that the district court found that if Captain Potter had reviewed the official charts he had on board the vessel he would have seen that, according to the charts, coming anywhere near Red Buoy 2 meant that the ship was substantially outside of the improved channel. This finding was not clearly erroneous. Osprey further argues that Captain Potter did what was required of him because as the vessel came up on Red Buoy 2 he asked Pilot Foster whether they were getting too close to the buoy. Pilot Foster told him there was plenty of water, and Captain Potter did not inquire further. The district court found that this was insufficient on Captain Potter's

part to assure the vessel's safety and that if he had properly prepared himself or the vessel for the voyage he would have known that the vessel was dangerously close to the buoy and to LW1. This finding was not clearly erroneous, and Osprey does not cite any authority that suggests otherwise. In sum, the district court's finding that Captain Potter was 50% liable for the allision because he relied solely on Pilot Foster, failed to familiarize himself with the conditions of the river, failed to consult any of the charts or instruments on board, and failed to fix the position of the vessel as it moved up the river was not clearly erroneous.

*NGSS:*

The last challenge raised is to the district court's finding that NGSS, the owner of LW1, was not liable. In this regard, Osprey and Pilot Foster take issue with the district court's application of the Pennsylvania Rule, which is "a presumption in admiralty law that a statutory violation by a party to a collision is a cause of the damage unless it is established that the violation could not have caused or contributed to the collision." *Am. River Transp. Co. v. Kavo Kaliakra S.S.*, 148 F.3d 446, 449 (5th Cir. 1998). The presumption is rebuttable. *See Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001). The Pennsylvania Rule holds that if a vessel is involved in a collision as a result of a violation of a statute intended to prevent collisions, then the vessel must show that the violation could not have been a cause of the accident. *See In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005). The rule applies to allisions as well. *See Trico Marine Assets, Inc. v. Diamond B Marine Servs., Inc.*, 332 F.3d 779, 786 (5th Cir. 2003). However, if the causal connection between the statutory violation and the damage is implausible the rule does not apply. *See Mid-South Towing*, 418 F.3d at 534. Further, "[w]hether the rule is applied against one or both parties to [ . . . an] allision, both may be liable if their negligence

15

No. 08-61125

proximately caused the accident, and damages are to be assessed in accordance with the principle of comparative negligence." *Sheriden Transp. Co. v. United States*, 834 F.2d 467, 478 (1987).

Osprey and Pilot Foster argue that NGSS was liable because LW1 was longer than its permit allowed. The district court held that the Pennsylvania Rule did not apply to any statutory violations NGSS was alleged to have committed because even if they had been committed, the causal connection between the violations and the allision was implausible because the allision was due to the negligence of Pilot Foster and Captain Potter. The district court held, moreover, that the only relevant statutory violations were committed by Captain Potter and the crew, who violated 33 C.F.R. § 164.11 of the Navigation Safety Regulations, which require that the owner, master, or person in charge of the vessel ensure that the wheelhouse is constantly manned, that the vessel's position at each fix be plotted on a chart and the master informed of the results, that navigational equipment be used to fix the vessel's position, that buoys alone not be used to fix the vessel's position, and that the danger of visual or radar contacts be evaluated and communicated to the person directing the vessel.

Pilot Foster's objection to this ruling on appeal misses the point entirely, focusing solely on whether NGSS violated its permits in building LW1 too long and failing to discuss the district court's holding that regardless of any alleged violations by NGSS, the cause of the allision was Pilot Foster's and Captain Potter's negligence. Osprey, for its part, argues that a previous case concerning an allision between a vessel and LW1 should control on the issue of NGSS' liability. In 1969, a vessel called the STELLA MARIS (piloted, in fact, by Pilot Foster's father) allided with LW1. That allision was the subject of a lawsuit culminating in a district court judgment finding liability on behalf of Ingalls Shipyard (the predecessor of NGSS) for the allision. *Am. Zinc Co. v. Pilot Foster*,

16

313 F. Supp. 671 (D.C. Miss. 1970), *aff'd except as to prejudgment interest*, *Am. Zinc Co. v. Pilot Foster*, 441 F.2d 1100 (5th Cir. 1971).

The factual differences between the STELLA MARIS allision and the current case, however, preclude such a result. At the time of the allision of the STELLA MARIS with LW1, it was night, and the light on Red Buoy 2 was not burning – therefore the pilot could not see Red Buoy 2 ahead of time. *Am. Zinc Co.*, 313 F. Supp. at 675. Nor could the lookout, who was properly posted (as was not the case on the CORMORANT), see the buoy. Those on the vessel thus did not see Red Buoy 2 until seconds before the ship allided with LW1. *Id.* In addition, the district court in *American Zinc* found that on the evening of that allision, Red Buoy 2 was out of place and was not properly marking LW1, as determined by both Ingalls (predecessor to NGSS and owner of LW1 at the time) and the Army Corps of Engineers. *Id.* at 679. In the present case, it was daylight, and Red Buoy 2 was plainly visible, and  the district court found it was in the proper position. Further, the STELLA MARIS had only a 23 or 24-foot draft, and therefore did not need to stay in the center of the improved channel in order to navigate safely.

The crucial difference lies in the determination of the cause-in-fact of the allision. In a situation in which the buoy marking the obstruction was out of place and was not visible, and the ship had only a 23-or 24-foot draft, the cause-in-fact of the allision may well have been the allegedly unauthorized length of LW1. But in this case, as the district court found, the cause-in-fact was different because the facts of the case were different. The vessel in this case had a much deeper draft, over 33 feet, resulting in a need to keep the vessel in the improved federal channel in order to avoid the risk of allisions. Further, Red Buoy 2 was properly marking LW1 and was clearly visible. Thus the cause-in-fact of this allision was Pilot Foster's negligence in piloting the vessel outside of the improved federal channel in the direction of a properly located buoy marking a

No. 08-61125

known submerged hazard – which Pilot Foster testified he knew existed and was marked by the buoy. The district court's finding that the length of LW1 was not the cause-in-fact of this allision is therefore not clearly erroneous and *American Zinc* is of little relevance.

## CONCLUSION

For the foregoing reasons we DISMISS Pilot Foster's appeal of the adverse summary judgment ruling against him, and AFFIRM the judgment of the district court in all other respects.