# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 24, 2022

Lyle W. Cayce
Clerk

No. 20-30019

SCF Waxler Marine, L.L.C., *doing business as* SCF Liquids,

*Plaintiff—Appellee*,

*versus*

Aris T M/V, *a bulk carrier ship, IMO No. 9343895, MMSI No. 2406260000, her engines, tackle, and other appurtenances, in rem, in admiralty*,

*Defendant—Appellee*,

*versus*

Genesis Marine, L.L.C., *owners and operators of the M/V Elizabeth Robinson and her tow*; Genesis Marine, L.L.C. of Delaware, *owners and operators of the M/V Elizabeth Robinson*,

*Third-Party Defendants—Appellants/Cross-Appellees*,

*versus*

Cenac Marine Services, L.L.C.,

*Third-Party Defendant—Appellee/Cross-Appellant*,

*versus*

No. 20-30019

ARIS T. ENE,

*Third-Party Defendant—Appellee*,

*versus*

VALERO REFINING - NEW ORLEANS, L.L.C.; MOTIVA ENTERPRISES, L.L.C.,

*Third-Party Plaintiffs—Appellees*,

———————————————————

VALERO REFINING - NEW ORLEANS, L.L.C.,

*Plaintiff—Appellee*,

*versus*

MARMARAS NAVIGATION LIMITED; ARIS T. ENE,

*Defendants—Appellees*,

*versus*

GENESIS MARINE, L.L.C., *owners and operators of the M/V Elizabeth Robinson and her tow*; GENESIS MARINE, L.L.C. OF DELAWARE, *owners and operators of the M/V Elizabeth Robinson*,

*Defendants—Appellants*,

———————————————————

MOTIVA ENTERPRISES, L.L.C.,

*Plaintiff—Appellee*,

*versus*

No. 20-30019

MARMARAS NAVIGATION LIMITED; ARIS T. ENE,

*Defendants—Appellees,*

*versus*

GENESIS MARINE, L.L.C., *owners and operators of the M/V Elizabeth Robinson and her tow*; GENESIS MARINE, L.L.C. OF DELAWARE, *owners and operators of the M/V Elizabeth Robinson,*

*Defendants—Appellants,*

---

SHELL CHEMICAL, L.P.,

*Plaintiff—Appellee,*

*versus*

MARMARAS NAVIGATION LIMITED; ARIS T. ENE,

*Defendants—Appellees,*

*versus*

GENESIS MARINE, L.L.C., *owners and operators of the M/V Elizabeth Robinson and her tow*; GENESIS MARINE, L.L.C. OF DELAWARE, *owners and operators of the M/V Elizabeth Robinson,*

*Defendants—Appellants,*

---

IN RE: IN THE MATTER OF THE COMPLAINT OF ARIS T. ENE, OWNER, AND MARMARAS NAVIGATION LIMITED, MANAGERS, OF THE ARIS T M/V, FOR EXONERATION FROM OR LIMITATION OF LIABILITY

No. 20-30019

ARIS T. ENE; MARMARAS NAVIGATION LIMITED, *as Managers of the Aris T M/V petitioning for Exoneration from or Limitation of Liability*,

*Petitioners—Appellees*,

*versus*

GENESIS MARINE, L.L.C., *owners and operators of the M/V Elizabeth Robinson and her tow*; GENESIS MARINE, L.L.C. OF DELAWARE, *owners and operators of the M/V Elizabeth Robinson*,

*Third-Party Plaintiffs–Claimants—Appellants/Cross-Appellees*,

*versus*

CENAC MARINE SERVICES, L.L.C.,

*Third-Party Defendant–Claimant—Appellee/Cross-Appellant*,

*versus*

SCF WAXLER MARINE, L.L.C., *doing business as* SCF LIQUIDS; MOTIVA ENTERPRISES, L.L.C.; SHELL CHEMICAL, L.P.; VALERO REFINING - NEW ORLEANS, L.L.C.; KIRBY INLAND MARINE, L.P.,

*Claimant—Appellee*,

ANTOINE MORRIS,

*Claimant—Appellee/Cross-Appellant*,

---

IN RE: IN THE MATTER OF THE COMPLAINT OF CENAC MARINE SERVICES, L.L.C., *Owner and Operator of M/V Loretta Cenac, Barge CTCO 338, Barge CTCO 339, and Barge CTCO Barge 357B, for Exoneration from or Limitation of Liability*

No. 20-30019

CENAC MARINE SERVICES L.L.C., *as owner and operator of the MV Loretta Cenac, Barge CTCO 338, Barge CTCO 339, and Barge CTCO Barge 357B, for Exoneration from or Limitation of Liability*,

> *Petitioner—Appellee/Cross-Appellant*,

*versus*

GENESIS MARINE, L.L.C., *owners and operators of the M/V Elizabeth Robinson and her tow;* GENESIS MARINE, L.L.C. OF DELAWARE, *owners and operators of the M/V Elizabeth Robinson*,

*Third-Party Plaintiffs–Defendants–Claimants—Appellants/Cross-Appellees*,

*versus*

ARIS T. ENE; MARMARAS NAVIGATION LIMITED,

> *Third-Party Plaintiffs–Defendants–Claimants—Appellees*,

VALERO REFINING - NEW ORLEANS, L.L.C.,

> *Third-Party Plaintiff–Claimant—Appellee/Cross-Appellant*,

MOTIVA ENTERPRISES,  L.L.C.,

> *Third-Party Plaintiff–Claimant—Appellee/Cross-Appellant*,

SHELL CHEMICAL, L.P.,

> *Claimant—Appellee/Cross-Appellant*,

*versus*

NEW YORK MARINE AND GENERAL INSURANCE COMPANY; STONINGTON INSURANCE COMPANY; NATIONAL SPECIALTY INSURANCE COMPANY,

> *Third-Party Defendants—Appellants/Cross-Appellees*,

CONTINENTAL INSURANCE COMPANY; AGCS MARINE INSURANCE COMPANY; LLOYD'S SYNDICATES, 4444CNP, 0958CNP, 1036COF, 1225AES, 0457WTK, 2003SJC, 0033HIS, 2001AML, 4472LIB, 2121ARG, 2623AFB, 0623AFB, 2987BRT, 1183TAL, 3000MKL AND 0382HDU 2001AML, 4472LIB, 2121ARG, 2623AFB, 0623AFB, 2987BRT, 1183TAL, 3000MKL AND 0382HDU,

*Third-Party Defendants—Appellees/Cross-Appellees*,

SCF WAXLER MARINE, L.L.C., *doing business as* SCF LIQUIDS; KIRBY INLAND MARINE, L.P.,

*Claimants—Appellees*,

*versus*

ANTOINE MORRIS,

*Claimant—Appellee/Cross-Appellant*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:16-CV-902, 2:16-CV-959, 2:16-CV-1022,
2:16-CV-1060, 2:16-CV-1134, 2:16-CV-1614

---

Before JONES, SMITH, and ELROD, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*:

On the evening of January 31, 2016, three vessels were travelling on the Mississippi River. Unfortunately, they did not pass peacefully in the night. This case is about why, and how fault should be assigned. Because we hold that the district court did not err in allocating the parties' respective

No. 20-30019

liabilities, in limiting the parties' liability, or in dismissing the personal injury claim, we AFFIRM.

I.

On the evening of January 31, 2016, the Mississippi River was running high. The weather was fair, and a light surface fog was developing on the portion of river near Hahnville, Louisiana.

The *Aris T* was moving up the Mississippi River at the same time the *Elizabeth* and the *Loretta* were moving down it.[1] The allision occurred as the three vessels were passing each other in the Hahnville Bar, a bend between mile markers 124.5 and 126 in the Mississippi River where a number of moorings are located. In a nutshell, the allision occurred as the *Aris T* was passing the *Loretta* and the *Elizabeth* at the same time as the *Loretta* was overtaking the *Elizabeth*, and given their positioning, there simply was not enough room for the three vessels to be adjacent to each other simultaneously.[2]

---

[1] The *Aris T* refers to the vessel itself and "*Aris T* Interests" refers collectively to the vessel, its owner Aris T. Ene, and its manager Marmaras Navigation Limited.

The *Elizabeth* refers to the vessel itself and "*Elizabeth* Interests" refers collectively to the co-owners of the defendant vessel: Genesis Marine, L.L.C. and Genesis Marine, L.L.C. of Delaware.

The *Loretta* refers to the vessel itself and "*Loretta* Interest" refers to its owner, Cenac Marine Services, L.L.C. (also referred to as "Cenac"). We also note that Cenac's various insurance companies (collectively, the "Insurance Parties") are involved in this case: Continental Insurance Company, AGCS Marine Insurance Company, New York Marine and General Insurance Company, Stonington Insurance Company, National Specialty Insurance Company, and Lloyd's Syndicates.

[2] A video reconstruction of the allision shows the paths of the vessels and includes relevant audio recorded from the *Aris T*'s VDR, which recorded all VHF transmissions sent or received by the *Aris T*'s VHF radio and all voices recorded on the four microphones located on the *Aris T*'s bridge. This video reconstruction was admitted into evidence, and no party has contested its accuracy.

The *Aris T* was mastered by Captain Baltas, but at all relevant times was piloted by Michael Leone, a compulsory pilot.[3] The *Aris T* was in good working order and its crew was duly trained. It was equipped with two Electronic Chart Display and Information System ("ECDIS") units which could be used for navigation, but at the time were only being used for training purposes and had limited functionality. Instead, the *Aris T* was using radar and paper charts for navigation, and Pilot Leone had a portable Rose Point electronic chart system.

The *Elizabeth* was under the command of Captain Christiansen. The *Elizabeth* was in good working order and navigated with both radar and a Rose Point system.

The *Loretta* was piloted by Captain Sanamo; it too was navigated with radar and a Rose Point system. Unlike the other two vessels, however, the *Loretta* was not in good working order. The *Loretta* was secured to the barges it was towing by two-part face wires.[4] At some point during these events, this wiring system failed, limiting the *Loretta*'s maneuverability. This was not the first time the *Loretta*'s face-wire system failed, but Cenac chose a band-aid solution rather than redesigning to a three-part face-wire system, which would have run back to the barge an additional time.

As the *Loretta* and the *Elizabeth* were approaching the Hahnville Bar, Captain Christiansen suggested to Captain Sanamo that the *Loretta* overtake the *Elizabeth*. Captain Sanamo had previously asked to overtake the *Elizabeth*, but at that point Captain Christiansen thought the maneuver was

---

[3] A compulsory pilot is "one who is legally required to be taken by the vessel owner," typically to guarantee that the pilot has knowledge of the local waters. Guy C. Stephenson, *A Pilot Is A Pilot: Compulsory Pilots—Vessel Owner's Responsibilities for Intervention and Personal Injury*, 70 Tul. L. Rev. 633, 634 (1995).

[4] Face wires secure the towboat to its tow. A face wire is two-part when it runs from winches on the towboat to terminal fittings welded to the deck of the barge (one part) and then back to the towboat (second part). Three-part face wire would then run back to the barge one more time.

too dangerous. But Captain Christiansen was going to be "stopping and backing up" at the Bayou Fleet, just south of the Hahnville Bar. Because he would be slowing down to back in, he thought that this was a good time for the *Loretta* to overtake him.

Further, Captain Christiansen mistakenly believed there was nothing nearby going upriver; neither he nor Captain Sanamo had heard the *Aris T*'s earlier announcement of its position over the radio, which could be because Pilot Leone transmitted using a handheld VHF radio from within the steel confines of the *Aris T*'s bridge. But the *Aris T*, despite being able to hear Captain Sanamo and Captain Christiansen's communications about the overtaking agreement, did nothing to correct the captains' faulty assumption that nothing was coming upriver towards them. Pilot Leone did not reach out and advise the *Elizabeth* and the *Loretta* of its upbound route, nor did he reduce the *Aris T*'s speed.

It was not until five minutes later, when the *Loretta* was already overtaking the *Elizabeth*, that Captain Christiansen reached out to Pilot Leone to organize the *Aris T*'s passing. They agreed to a one-whistle, port-to-port side passing. Captain Sanamo then reached out to Pilot Leone, and they too organized a port-to-port side passing. This meant that the three vessels agreed to pass each other with the *Elizabeth* on the west moving downriver, the *Aris T* on the east moving upriver, and the *Loretta* in between them moving downriver, overtaking the *Elizabeth*.

It did not go as planned. Because Captain Christiansen said the *Elizabeth* would be backing into the Bayou Fleet, Captain Sanamo and Pilot Leone expected the *Elizabeth* to be very close to the west bank. But instead, the *Elizabeth* was in the middle of the river, and continuously slid east during the passing due to the four- to five-knot current. This greatly reduced the amount of space the *Loretta* and the *Aris T* had to execute their pass. Captain Sanamo, perhaps realizing there might not be sufficient space, suggested to Pilot Leone that the *Loretta* abandon its attempt to overtake the *Elizabeth*.

At this point, "the maneuver was so precarious that it could only work if: "(a) the *Elizabeth* somehow stopped its slide and began moving towards the west bank, which it gave no sign of doing; (b) the *Loretta* could somehow push out in front of the *Elizabeth* to complete the overtaking maneuver, which it had not been able to do thus far; and (c) nothing else went wrong." But Pilot Leone told Captain Sanamo there was "plenty of room" and to continue forward, and Captain Sanamo did not protest. Pilot Leone momentarily suggested altering the passing plan so the *Aris T* would pass in between the *Loretta* and the *Elizabeth*, but he quickly recanted that suggestion. And so, despite the limited river space, the boats proceeded with their planned passage.

The *Elizabeth* continued sliding east, which forced Captain Sanamo to slow down to avoid colliding with the *Elizabeth*, and this kept the *Loretta* in the *Aris T*'s path. Further preventing the *Loretta* from getting out of the *Aris T*'s path was its face wire breaking.[5] Cenac discarded the face wire before it could be examined.

At some point, Pilot Leone realized the *Aris T* was on course to hit the *Loretta*, so he took emergency evasive maneuvers. The maneuvers avoided a collision with the *Loretta*. But they resulted in the *Aris T*'s colliding with the vessel *SCF Vision*, which was moored at the Valero facility. The *SCF Vision* in turn struck and damaged the Valero facility. The *Aris T*, at this point trying to stop, then collided with the vessels *M/V Pedernales* and *Kirby 28080* and allided with Shell/Motiva Berth 4 and Berth 2, damaging both of them.[6]

---

[5] The parties contest whether the face wire broke before or after the accident occurred. The district court, after hearing testimony and reviewing the *Loretta*'s Rose Point system, camera, and radar footage, concluded that it broke before the passing was complete.

[6] We refer to the owners of vessels that were moored at or near the docks and came into the *Aris T*'s collision course as the "Vessel Plaintiffs."

During the failed passing, Captain Christiansen was incommunicado with Captain Sanamo and Pilot Leone. He later testified that their passing each other did not concern his vessel, so there was no need for him to communicate with them, even though his not acting in accordance with his stated intention to back into the Bayou Fleet reduced their maneuvering space. Captain Sanamo was talking on his cell phone with his girlfriend during the accident, in violation of Cenac's cell phone policy. And Pilot Leone failed to react appropriately to the overtaking announcement and kept the *Aris T* going at speed, rather than slowing down.

While this was happening, Antoine Morris, an employee of Shell/Motiva, was working at Shell/Motiva Berth 1, located about 1000 feet from Berth 2. Upon hearing a warning from the Berth 4 operator about the accident, Morris decided to walk to the emergency shutdown device to turn off the dock's product lines. But while on his way, upon seeing the *Aris T* in the distance, Morris panicked, lost his footing, and fell. Immediately after his fall, he was able to get up and walk.

He remained at work until his shift ended and did not report any symptoms to his coworker or supervisor. He later saw a series of doctors, and was eventually diagnosed with PTSD and a traumatic brain injury by Dr. Axelrad, the third doctor he saw.[7] An independent evaluator, Dr. Ginzburg, testified that Morris did not have either of these ailments.

SCF Waxler Marine, L.L.C., owner of the moored vessel *SCF Vision*, sued the *Aris T*, *in rem*, for damages caused by the accident. Then, each of the Shore Plaintiffs[8] sued both the *Aris T in rem* and the other *Aris T* Interests *in personam*. Then the *Aris T* filed a complaint under the Limitation of

---

[7] At the first and second doctor's visits, Morris denied hitting his head or experiencing any concussion symptoms, but he did complain of neck pain.

[8] "Shore Plaintiffs" refers to the owners of the docks and berths damaged by the accident: Valero Refining - New Orleans, L.L.C. ("Valero"), Motiva Enterprises, L.L.C., and Shell Chemical, L.P.

Liability Act,[9] asserting that the owners were not liable, and the *Loretta* Interest did the same.  The cases were consolidated, and thereafter, the *Loretta* Interest and the *Aris T* Interests filed third-party complaints against the *Elizabeth* Interests.

The *Elizabeth* Interests then asserted limitation of liability as a defense.  Morris asserted claims in the limitation proceedings, seeking claims for personal injuries.  Finally, the Shore Plaintiffs filed third party complaints against the Insurance Parties under "Louisiana's direct-action statute, La. R.S. 22:1269, which allows injured persons to sue the insurers of a person alleged to have caused and accident."

Two bench trials followed under Federal Rule of Civil Procedure 52. First, the district court tried the negligence and limitation-of-liability claims over the course of 10 days.  Second, the district court tried Morris's personal injury case.  Before the bench trials commenced, the district court denied the Shore Plaintiffs motion for partial summary judgment on the issue of whether the Insurance Parties could limit their liability if the *Loretta* Interest could.

The district court found that the *Elizabeth*, *Loretta*, and *Aris T* were all liable for the damages to the Shore Plaintiffs and Vessel Plaintiffs.  The court used maritime statutes and regulations, including the U.S. Inland Navigation Rules, 33 C.F.R. §§ 83.01, *et seq.*, to determine the applicable standards of care.  Because comparative fault applies to maritime accidents, the district court then described each vessel's faults.  It found the *Loretta* and *Elizabeth* primarily and equally at fault for creating the dangerous situation with their overtaking agreement (allocating 45% of the liability to each) and found the *Aris T* at fault to a lesser extent (allocating 10% of the liability).

---

[9] 46 U.S.C. §§ 30501, *et seq.*  The Act allows owners of vessels involved in accidents to limit their liability to the value of the vessel and pending freight in certain situations.  *See id.* § 30505.  It also allows them to proactively bring suits to claim this limited liability.  *Id.* § 30511.

The district court ruled that the *Loretta* Interest and the *Elizabeth* Interests could not limit their liability because they were themselves negligent but that the *Aris T* Interests could limit their liability because the culpability rested solely with the compulsory pilot, Pilot Leone.

Finally, the district court dismissed Morris's claims with prejudice. It found that the cause of his injuries was his own carelessness and inattention, and not the *Aris T*'s alliding with a different berth; therefore, Morris could not establish the duty or cause elements of his claim. It further found that Morris could not recover for emotional injuries under a "zone of danger" theory because he was not in the zone of danger.

## II.

Four appeals involving different subsets of the parties were consolidated into this case. The *Elizabeth* Interests appeal the district court's assigning them 45% of the fault and denying its limitation of liability. The *Loretta* Interest appeals on the same grounds as the *Elizabeth* Interests. The Shore Plaintiffs appeal the district court's previous denial of partial summary judgment regarding the Cenac Insurer's ability to limit their liability to that of the *Loretta* Interest. Finally, Morris appeals the district court's dismissal of his case.

### A. Allocation of Liability

The first issue in this appeal is whether the district court erred in its allocation of fault among the three vessel defendants: the *Elizabeth*, the *Loretta*, and the *Aris T*.

Negligence in general maritime law operates much like negligence in state tort law. To establish maritime negligence, "a plaintiff must demonstrate that there was [1] a duty owed by the defendant to the plaintiff, [2] breach of that duty, [3] injury sustained by the plaintiff, and [4] a causal connection between the defendant's conduct and the plaintiff's injury."

*GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 659 (5th Cir. 2017) (quotation omitted).

The appellants, the *Loretta* Interest and the *Elizabeth* Interests, do not contest that they are liable. Instead, they contest how the district court apportioned fault among them and the *Aris T* Interests. "[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault . . . ." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975). "Apportionment is not a mechanical exercise that depends upon counting up the errors committed by both parties. The trial court must determine, based upon the number and quality of faults by each party, the role each fault had in causing the collision." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 370 (5th Cir. 2006).

"[W]e review 'a trial court's finding on apportionment of relative fault in a maritime collision' only for clear error." *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 609 (5th Cir. 2020) (quoting *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017)). Allocation is treated as a finding of fact. *See Deloach*, 974 F.3d at 607. "Even if we might have given different weight to different pieces of evidence than did the district court, this is not a reason to disturb that court's findings of relative responsibility, absent a showing of clear error." *Id.* at 609 (quotation omitted). The exception to this is "when factual findings in an admiralty case are essentially based on an incorrect legal principle, [the] Rule 52(a) clearly erroneous [standard] does not apply and we disregard any such possible findings." *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1142 (5th Cir. 1994) (quotation omitted).

No. 20-30019

The *Elizabeth* Interests and the *Loretta* Interest argue that they should be allocated less than 45% of the fault and that others should be allocated more. The *Aris T* Interests and the Shore Plaintiffs defend the district court's apportionment.

We do not find error in the district court's evaluation of the *Elizabeth*'s violations of the Inland Navigation Rules or in the *Loretta*'s violations of the Inland Navigation Rules.[10] The district court correctly found that the *Elizabeth* violated Inland Rules 2 (prudent seamanship), 5 (lookout), 7 (risk of collision), 8 (action to avoid collision), 9 (keeping to the outer limit of the channel that lies on the vessel's starboard side as is safe and practicable), and 17 (action by stand-on vessel). In addition, the district court properly found that the *Loretta* violated Inland Rules 2 (prudent seamanship), 5 (lookout), 7 (risk of collision), 8 (action to avoid collision), 9 (failure to propose manner of passing in narrow channel), 13 (overtaking), 14 (failure to propose manner of passing in meeting situation), 16 (action by give-way vessel), and 34(d) (danger signal). Finally, the district court properly found that the *Aris T* was liable for violating Inland Rules 2 (prudent seamanship), 6 (safe speed), 7 (risk of collision), and 9 (failure to hold up to allow a safe passing).

Though the district court did not mention whether the *Aris T* violated Inland Rules 8, 14, and 16, we do not consider that to be clearly erroneous. Rather, based on the conflicting evidence presented at trial, we infer that the

---

[10] Relatedly, we hold that the district court did not abuse its discretion in relying on undisclosed portions of Cunningham's testimony elicited on cross examination, and that even assuming *arguendo* that it was error to admit the testimony, such error was harmless because the district court only relied upon disclosed portions of his testimony in its Findings of Fact and Conclusions of Law.

We also hold that the district court did not abuse its discretion in determining that the *Loretta*'s face wire was in poor condition.

district court (based on its ultimate conclusions) did not believe that the *Aris T* violated Inland Rules 8 and 16 because she could not have taken "early and substantial" "positive" action to avoid the incident based on the narrow passage facing the vessels (and the relative positions of the *Elizabeth* and the *Loretta*). *See* 33 C.F.R. §§ 83.08, 83.16. And given that the *Aris T* was entering the outside bend of a west-bound turn in high-current conditions, we infer that the district court concluded that the *Aris T* did not violate Inland Rule 14 because she could not have altered her course any more than she already had leading up to the incident. *See id.* § 83.14. And in any event, the conflicting evidence on what the *Aris T* could have done under those circumstances leaves little room for legal error. Thus, though the district court did not mention these Inland Rules in discussing the *Aris T*'s liability, we find no clear error in its ultimate conclusions.

We thus conclude that the district court did not clearly err in allocating liability as to the *Elizabeth*, the *Loretta*, or the *Aris T*.

## B. Limitations of Liability

The *Aris T* Interests, *Elizabeth* Interests, *Loretta* Interest, and the excess insurers for the *Loretta* Interest all claim the right to limit their respective liability to the value of their vessels, plus pending freight at the conclusion of the voyage. The district court found that the *Aris T* Interests are able to do so but that the others could not.

There are two distinct ways the owner of a vessel involved in an accident can limit its liability to the value of the vessel and its freight. First, the Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.*, provides for such limitation in certain situations. The *Loretta* Interest and the *Elizabeth* Interests claim their liability should be limited under the Act, an argument addressed in Part II.B.1 below. Second, when the negligence of a vessel is attributable solely to a compulsory pilot, the vessel is only liable *in rem*,

effectively limiting the owner's liability to the same extent as the Limitation of Liability Act. *See Probo II London v. Isla Santay MV*, 92 F.3d 361, 365 (5th Cir. 1996). The *Aris T* Interests assert their liability should be limited in this way, as the district court found. This is addressed in Part II.B.2 below.

1.

The Limitation of Liability Act provides that "the liability of the owner of a vessel for any claim, debt, or liability" "arising from . . . any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner" "shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505(a)–(b).

In short, "[u]nder the Act, a party is entitled to limitation only if it is '*without privity or knowledge*' of the cause of the loss." *In re Hellenic Inc.*, 252 F.3d 391, 394 (5th Cir. 2001) (emphasis added) (quoting *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994)). Furthermore, "if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the [ship owner] must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789 (5th Cir. 2003). "[K]nowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known." *Id.* at 789–90. That is, if the unseaworthy "condition could have been discovered through the exercise of reasonable diligence," a corporate owner is deemed to have knowledge of it and cannot limit its liability. *In re Omega Protein, Inc.*, 548 F.3d 361, 371 (5th Cir. 2008) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 356 (5th Cir. 1991)).

Importantly, the owner must have privity or knowledge of the "acts of negligence or conditions of unseaworthiness [that] *caused* the accident." *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976) (emphasis added).

The owner's knowledge of acts of negligence or conditions of unseaworthiness that did not cause the accident does not prevent the owner from limiting liability. *See id.*; *see also In re Omega Protein*, 548 F.3d at 369–70 (finding that the owner's failure to train its employees on a navigation system did not mean they could not limit liability when the failure to use the navigation system did not cause the accident). Similarly, the owner's knowledge of acts that actually caused the accident, but were not acts of negligence or conditions of unseaworthiness, does not prevent the owner from limiting liability. *See Farrell Lines Inc.*, 530 F.2d at 10.

A vessel can be rendered unseaworthy by having either insufficient equipment or an insufficiently competent and trained crew. *See Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001). Thus, the privity or knowledge standard "obliges the owner to select a competent master." *In re Omega Protein*, 548 F.3d at 374. It also requires the owner to properly train the master and crew. *See Trico Marine Assets*, 332 F.3d at 790 (finding knowledge when the "captain was improperly trained"). It does not, however, render the owner liable for "mere 'mistakes of navigation' by an otherwise competent crew." *In re Omega Protein*, 548 F.3d at 371 (quoting *Brister*, 946 F.2d at 356). This is because "when the owner is so far removed from the vessel that he can exert no control over the master's actions, he should not be taxed with the master's negligence." *Cont'l Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1377 n.15 (5th Cir. 1983) (en banc).

Therefore, when the cause of the allision was the crew's errors, the owner's ability to limit its liability turns on whether the crew was incompetent, which the owner should have known, or whether the crew made mere mistakes of navigation, which the owner could not have known about. A captain's record and years of experience are relevant to this inquiry. *See Kristie Leigh Enters. v. Am. Com. Lines*, 72 F.3d 479, 482 (5th Cir. 1996). Also relevant is the owner's knowledge of how well trained the captain is. *See*

*Trico Marine Assets*, 332 F.3d at 790.  Finally, all of these questions—the cause of the accident, the owner's privity or knowledge, and the crew's competence—are fact-specific, and therefore subject to clear-error review. *See In re Omega Protein*, 548 F.3d at 361.

The district court found that the *Elizabeth* Interests could not limit their liability because they themselves were negligent in: (1) hiring an incompetent master without doing a proper background check; (2) failing to properly train Captain Christiansen in how to use the Rose Point navigation system; and (3) approving Captain Christiansen's decision to maneuver into the Bayou Fleet without an assist tug.  Further, the court found that the *Loretta* Interest could not limit its liability because it was negligent in (1) sending the *Loretta* out with an inadequate face-wire system, and (2) not enforcing its cell-phone policy.  The district court found that the *Aris T* owners could limit their liability.

In challenging this ruling, the *Elizabeth* Interests contend that the district court's finding that Captain Christiansen was incompetent was error.  They point out that the Coast Guard did not cite Captain Christiansen for the incident, but the Coast Guard did cite Captain Sanamo and Pilot Leone.  Moreover, Captain Christiansen had years of experience navigating the Hahnville Bar, and his prior suspensions were twenty years before this incident and not at all relevant to evaluating his competence here.  Given all this, the *Elizabeth* Interests contend that Captain Christiansen's errors were mere mistakes of navigation that the *Elizabeth*'s owners could not have known of, and not incompetence they should have known about before hiring him.  We agree that the district court erred in finding Captain Christiansen incompetent.

Nevertheless, the district court provided two other grounds for not limiting the *Elizabeth* Interests' liability:  the *Elizabeth* Interests failed to

No. 20-30019

provide Captain Christiansen with training on the Rose Point navigation system—which resulted in Captain Christiansen's not using all available means to maintain a proper lookout—and the *Elizabeth* Interests' general manager approved the down-streaming maneuver without a tugboat assist that was employed by Captain Christiansen during the allision sequence. The *Elizabeth* Interests thus had "privity or knowledge" of the conditions that contributed to the *Aris T*'s allision. 46 U.S.C. § 30505(b). We affirm on these grounds.

The *Loretta* Interest, Cenac, contends the district court erred in finding that Cenac could not limit its liability. Cenac argues that the factors the district court held that Cenac had knowledge of—the faulty face-wire system and Captain Sanamo's talking on his cell phone—were not *causes* of the accident. Cenac posits that the face wire parting could not have been a cause of the accident because, according to Cenac, the parting did not occur until after the *Loretta* was mostly past the *Aris T*. Cenac points to Captain Sanamo's testimony as to when he believed it broke, as well as to some expert testimony that the *Loretta* could not have maneuvered as it did if the face wire had broken earlier. Cenac also posits that Captain Sanamo's cell phone call with his girlfriend during the accident was not a cause of the accident because it did not distract him. According to Cenac, though the line was open, Captain Sanamo was not actively talking with his girlfriend and was adequately focused on the task at hand, as evidenced by his active communication with Pilot Leone on the radio. Thus, because Cenac believes these factors were not causes of the accident, Cenac contends that those issues do not preclude it from limiting its liability.

We affirm the district court because the district court's finding of causality with respect to these issues was not clearly erroneous.[11]  It was not error for the district court to discount Captain Sanamo's testimony about the face wire, and instead credit other expert testimony and evidence (*e.g.*, radar and video footage) that it broke earlier, and thus was a cause of the allision. Moreover, it was not error for the district court to conclude that the cell phone was a distraction and a cause of the allision, especially in light of the fact that the Coast Guard sanctioned Captain Sanamo for it.

Thus, we affirm the district court's ruling that the Limitation of Liability Act does not allow the *Elizabeth* Interests or the *Loretta* Interest to limit liability in this case.

2.

The district court determined that the *Aris T* could limit its liability using the "compulsory pilot" defense.  "[T]he 'compulsory pilot defense,' can be traced back to" as early as the nineteenth century. *Probo II London*, 92 F.3d at 365.  Under it, "the vessel itself is liable *in rem* for a maritime collision caused by the fault of its compulsory pilot; if the pilot alone was at fault, the shipowner will not be liable *in personam*; however, if the negligence of the master or crew contributed to the collision, then in addition to the vessel's liability *in rem* the shipowner also will face *in personam* liability." *Id.*

The negligence of a vessel's master can contribute to an allision either through actions or omissions.  Generally, the "master is entitled to assume that the pilot is an expert on local conditions and practices," and defers to his command.  *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 493 (5th Cir. 1994).  But the master may not "regard the presence of a duly-

---

[11] Because we affirm the district court's ruling that Cenac may not limit its liability, we dismiss as moot Cenac's excess insurers' challenge.

licensed pilot in compulsory pilot waters as freeing him from every obligation to attend to the safety of the vessel." *The Oregon*, 158 U.S. 186, 195 (1895). Instead, if "it becomes manifest that the pilot is steering the vessel into danger," the master is negligent if he does not timely intervene. *Avondale*, 15 F.3d at 493. This responsibility to intervene places a duty on the ship's master to maintain an "adequate level of information" about the ship's navigation. *Id.*

The *Elizabeth* Interests and the *Loretta* Interest contend the district court erred in allowing the *Aris T* to limit its liability because the negligence contributing to the allision can be attributed to more than just Pilot Leone's decisions. First, they argue that Captain Baltas, the *Aris T*'s master, agreed with Pilot Leone's decisions and therefore the crew's negligence contributed to the allision. Second, they contend that the shipowner's failure to equip the *Aris T* with a functional ECDIS system was negligent and contributed to the accident. Third, they contend that the shipowner offered no training to its bridge officers on the Inland Rules of Navigation.

We affirm the district court's ruling that the *Aris T* can limit its liability. Captain Baltas was monitoring the situation, and he was entitled to trust Pilot Leone's greater expertise on the spacing in the Hahnville Bar. Moreover, the *Aris T* was adequately equipped; the ECDIS system was not mandatory at the time, and Pilot Leone had the same navigation system as the *Elizabeth* and the *Loretta*. Finally, Pilot Leone had adequate knowledge of the Inland Rules of Navigation; the point of having compulsory pilots for areas with specific navigational rules is to compensate for the crew's lack of knowledge in that area. We conclude that the *Aris T*'s negligence was attributable solely to the compulsory pilot, Pilot Leone, and therefore, the *Aris T* is only liable *in rem*.

No. 20-30019

## C. The Personal Injury Claim

Antoine Morris, a Shell/Motiva employee was working on a berth when he caught sight of the *Aris T* alliding with a berth over 1,000 feet away. The berth he was standing on was not struck and did not move or shake. Morris simply panicked at the surprising sight of the vessel alliding with another berth, lost his footing, and fell. The district court dismissed his negligence claim, and Morris challenges the dismissal on both procedural and substantive grounds. We affirm the district court's dismissal.

Morris raises four points of error. First, he contends that the district court abused its discretion by denying him a continuance on the morning of the trial because his key expert, Dr. Axelrad, was at his brother's deathbed and would be unable to testify in person. This prejudiced him, Morris says, because the other parties' expert witness sharply criticized Dr. Axelrad's deposition testimony, and Dr. Axelrad could not respond.

The matter of a continuance is reviewed for abuse of discretion. *See Avery v. Alabama*, 308 U.S. 444, 446 (1940). District courts are given "exceedingly wide" discretion in making "scheduling decision[s], such as whether a continuance should be granted." *HC Gun & Knife Shows, Inc. v. City of Hous.*, 201 F.3d 544, 549 (5th Cir. 2000). We determine that the district court did not abuse its discretion in denying the last-minute continuance. The numerous other parties also had expert witnesses who had arranged their schedules around the existing trial dates. Denying the continuance did not prejudice Morris because the trial court admitted Dr. Axelrad's video perpetuation deposition as evidence. As the district court explained, "[the video] was taken for perpetuation purposes, and that's what the rules provide, and for -- just for situations such as this that are unanticipated that render a witness unavailable, and then the deposition becomes the reasonable substitute for that testimony."

23

Second, Morris contends that the district court erred by relying on the testimony of Dr. Ginzburg, a forensic psychiatrist retained by the *Aris T* Interests, over Morris's expert, Dr. Axelrad.  Under Federal Rule of Civil Procedure 52, "findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009).  Because Morris's objection is about the district court's finding that one expert's account of Morris's injury was factually correct, it is reviewed for clear error.  "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).  Objective evidence contradicting a witness's testimony or internal inconsistencies can render a district court's accepting a witness's testimony clearly erroneous.  *Id.*  "But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.*

District courts make credibility decisions, and the district court was well within its discretion to credit Dr. Ginzburg's diagnosis over Dr. Axelrad's.  Morris has pointed to no inconsistencies in Dr. Ginzburg's testimony, nor has he pointed to any extrinsic evidence that leaves a firm conviction that the district court's crediting Dr. Ginzburg was error.

Third, Morris asserts that the district court erred in concluding he was not in the zone of danger and therefore could not recover emotional damages. He argues that the district court impermissibly relied on the fortuity that the berth Morris was on was not struck, and that despite this, the *Aris T* was close enough to Morris to put him in immediate danger.  Specifically, he argues that the 1,000-foot distance between the *Aris T* and himself was not that large

No. 20-30019

because the *Aris T* was large, and the poor visibility conditions made it seem closer than it was.

Under a zone-of-danger tort theory, plaintiffs can recover for emotional injuries if they "are placed in immediate risk of physical harm by that conduct." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 548 (1994). The theory extends the ambit of plaintiffs who can recover for emotional injuries from those who sustain a physical impact from the tort to those who were close enough to reasonably be emotionally damaged by it. *See id.* at 547–48.

We have "repeatedly declined to adopt or preclude the zone of danger theory" for general maritime law. *Gough v. Nat. Gas Pipeline Co. of Am.*, 996 F.2d 763, 766 (5th Cir. 1993).[12] Even assuming *arguendo* that plaintiffs can recover under the zone-of-danger theory in general maritime law, analogous case law from other contexts state that a plaintiff must establish that "the claimant was objectively within the zone of danger; claimant feared for his life at the time of the accident or person was in danger, and his emotional injuries were a reasonably foreseeable consequence of the defendant's alleged negligence." *Owens*, 2005 WL 840502, at *3. To be in the zone of danger, a plaintiff must be in "immediate risk of physical harm." *Consol. Rail Corp.*, 512 U.S. at 548. And in determining whether emotional injuries were reasonably foreseeable, courts can consider the experience seamen are likely to have. *See Plaisance v. Texaco, Inc.*, 966 F.2d 166, 168 (5th Cir. 1992) (en banc).

---

[12] Our court, however, has allowed recovery under a zone-of-danger theory under the Jones Act. *See Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 938 (5th Cir. 2014). Moreover, district courts throughout the circuit regularly allow recovery under general maritime law using this theory. *See, e.g.*, *Owens v. Glob. Santa Fe Drilling Co.*, No. Civ. A. 04-702, 2005 WL 840502, at * 3 (E.D. La. Apr. 8, 2005) (citing *Anselmi v. Penrod Drilling Corp.*, 813 F. Supp. 438, 442 (E.D. La. 1993); *Williams v. Treasure Chest Casino, L.L.C.*, Nos. 2:95-CV-3968, 2:97-CV-0947, 1998 WL 42586 (E.D. La. Feb. 4, 1998)).

No. 20-30019

We agree with the district court.  Morris was never in any danger of being hurt by the *Aris T*, as he had ample time to leave the berth before the *Aris T* would have reached it.  The ship was travelling less than 3 miles per hour, giving Morris several minutes to leave the berth, even with his fall.  Moreover, Morris remained on the berth after his fall.

Finally, Morris argues that the accident was a substantial cause of his fall, so he can recover physical damages.  "Questions of . . . causation[] are factual issues, and may not be set aside on appeal unless clearly erroneous." *In re Omega Protein*, 548 F.3d at 367.  Under maritime law, causation requires that the negligence be "a substantial factor" in the injury.  *Donaghey*, 974 F.2d at 649 (citation omitted).  "The term 'substantial factor' means more than 'but for the negligence, the harm would not have resulted.'"  *Id.* (quoting *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975)).  In addition, foreseeability is also relevant to the proximate-cause determination.  *See In re Signal*, 579 F.3d at 490 n.12.

The district court's determination of causation is subject to clear-error review, and nothing Morris has pointed to leaves a firm conviction that the accident was a substantial factor in his fall.  On the contrary, we agree with the district court's conclusion that Morris unreasonably panicked, and that this unforeseeable panic caused the accident.  Thus, at a minimum, he cannot meet the proximate-cause element of his negligence case.

## III.

For these reasons, we AFFIRM the judgment in all respects.

26